IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

FAMILY OF CARE REAL ESTATE              :
HOLDING CO., INC., et al.                  :

    v.                         :    Civil Action No. DKC 23-574

                              :
CHAPMAN PROPERTY, LLC
                              :

**MEMORANDUM OPINION**

Presently pending and ready for resolution in this breach of contract case involving a disputed sale of a nursing home are: (1) the motion for partial summary judgment on Count I of the counterclaim filed by Plaintiffs and Counter Defendants Family of Care Real Estate Holding Co., Inc. and Charles County Nursing and Rehabilitation Center, Inc. ("Sellers") (ECF No. 115); (2) Sellers' amended motion to seal their motion for partial summary judgment (ECF No. 120); (3) the motion to seal the amended opposition to Sellers' motion for partial summary judgment filed by Defendant and Counter Claimant Chapman Property, LLC ("Purchaser") (ECF No. 138); (4) Sellers' motion to seal its opposition to Purchaser's motion for summary judgment on Counts II and III of the counterclaim (ECF No. 142); (5) Sellers' motion to seal its reply and opposition to Purchaser's opposition (ECF No. 145); (6) Purchaser's amended cross-motion for summary judgment on Count I of the counterclaim and opposition to Sellers'

motion for partial summary judgment (ECF No. 147); and (7) Purchaser's amended motion for summary judgment on Counts II and III of the counterclaim (ECF No. 148).  The issues have been briefed, and the court now rules, no hearing being deemed necessary.  Local Rule 105.6.  For the following reasons, the motions to seal will be granted, Sellers' motion for partial summary judgment on Count I of the counterclaim will be denied, Purchaser's amended cross-motion for summary judgment on Count I of the counterclaim will be denied, and Purchaser's amended motion for summary judgment on Counts II and III of the counterclaim will be denied.  Partial summary judgment, however, will be entered in Sellers' favor on the issue of whether Sellers breached the APA by decreasing direct patient care hours.

## I.   Background[1]

On May 6, 2022, Sellers and Purchaser entered into a letter of intent ("LOI") for the sale of a skilled nursing facility (the "Facility").  (ECF Nos. 115-10, at 3; 119-10).  The LOI provided that the purchase price would be $28,200,000 and described the Facility as "situated on an unsubdivided part of a 16.82+/- acre campus[.]"  (ECF Nos. 115-10, at 3-4; 119-10).  In accordance with the LOI, the Sellers and Buyer entered into an Asset Purchase Agreement (the "APA") on September 12, 2022.  (ECF Nos. 115-9;

---

[1] Unless otherwise noted, the facts outlined here are undisputed.

119-9).  The APA provides that Sellers will sell the Facility and property on which it sits (the "Property") to Purchaser for $28,200,000.  (ECF Nos. 115-9, at 3, 6; 119-9, at 3, 6).

Section 7 of the APA contains two potential extensions of the closing date that Purchaser could elect.  (ECF Nos. 115-9, at 7-8; 119-9, at 7-8).  Purchaser exercised both extensions, leading to a closing date of February 1, 2023.  (ECF Nos. 115-1, at 9; 119-1, at 9; 137, at 8; 147, at 7).

Section 14(a) of the APA requires Sellers to "operate and maintain the Property and the Facility as a skilled nursing facility . . . consistent with its operation and maintenance at the time of execution of this Agreement."  (ECF Nos. 115-9, at 20; 119-9, at 20).

Section 14(q) of the APA requires Sellers to "apply for and obtain all necessary approvals" within 30 days of execution of the APA for a condominium regime "so that the Seller's affiliated assisted living and adult daycare (the "Seller Continuing Companies") will be a separate condominium unit and tax parcel from the Purchaser's Facility[.]"  (ECF Nos. 115-9, at 24; 119-9, at 24).  The provision states that the "Condominium shall also have two additional land parcels to create the North Wooded Parcel and the South Wooded Parcel in the approximate location and as designated on Exhibit E and the Purchaser shall have the option to purchase the South Wooded Parcel[.]"  (*Id.*).  Exhibit E is blank.

(ECF Nos. 115-9, at 49; 119-9, at 49).  The provision requires the parties to agree to "the condominium plat, master deed, by-laws and other documents (collectively, the "Condo Agreements") . . . prior to Closing" and provides that the Condo Agreements must include "easements for access, parking, drainage, utilities, identification sign, and other matters as well as cost sharing provisions related thereto as well as the Restrictive Covenants and the Right of First Refusal . . . and the Subdivision Covenant[.]" (ECF Nos. 115-9, at 24; 119-9, at 24).  Finally, the provision requires the parties to "agree on a revised legal description for the Purchaser's Real Property to reference the Condominium and the units being conveyed" in Exhibit A-2.  (*Id.*). Exhibit A-2 is also blank.  (ECF Nos. 115-9, at 45; 119-9, at 45).

Because the parties executed the APA on September 12, 2022, the deadline for Sellers to obtain approval for the Condo Agreements was October 12, 2022.  On October 14, 2022, Sellers sent Purchaser a memorandum via email stating that Sellers were "continuing to finalize drafts" of the Condo Agreements.  (ECF Nos. 115-15, at 3; 119-15, at 3).  Sellers' counsel then sent their draft Condo Agreements to Purchaser's counsel on October 20, 2022. (ECF Nos. 115-15, at 8; 119-15, at 8).  Purchaser sent Sellers a list of changes to the drafts on November 29, 2022.  (ECF Nos. 115-17, at 2; 119-17).  Sellers' counsel sent revised drafts to Purchaser's counsel on December 23, 2022.  (ECF Nos. 115-18, at 2;

119-18).   Sellers' counsel asked Purchaser's counsel multiple times to provide their revisions to the drafts.   (ECF Nos. 115-19, at 7-9; 115-20; 119-19; 119-20).

On January 11, 2023, the chief acquisition officer from Purchaser's affiliate company, Uri Kahanow ("Mr. Kahanow"), sent Sellers' counsel an email stating:

> As discussed we heard back from our bank today that [their] committee is prepared to move forward with the loan.   It comes along with thresholds, escrows, and SWAP requirements that are workable but do impact the numbers. This combined with the impact of the numbers outlined below which combined have a total negative impact of more than $4MM over a 5 year period to our bottom line.   Internally we do not plan on being profitable year 1 but we cannot absorb significant losses.   We would need a $1.5MM adjustment in the purchase price to move forward and cushion some of the impact.
>
> If this is acceptable the only two outstanding items would be the condo docs which Joe has two outside attorneys working on and the timing which we are waiting on confirmation if the bank will have everything they need to close by Feb 1st or if they will need to push the closing off for 2 weeks.   We understand this hasn't always been as smooth as anticipated and we hope you could appreciate that we are in [] very challenging capital markets for turnaround opportunities with more than half of the traditional healthcare banks not lending at all.   The good news is we believe we have most of the stresses behind us.   We appreciate the consideration and look forward to hearing back.

(ECF Nos. 115-23, at 2; 119-23).

Also on January 11, 2023, Sellers' counsel sent Purchaser's counsel a letter stating:

> It has come to my attention that Uri [K]ahanow confirmed in writing today his communication to Andrea Dwyer, that Chapman Property LLC (the "Purchaser") has not (and will not be able to) timely secure funding necessary to enable it to pay the full purchase price of $28,200,000.00 (the "Purchase Price") for the purchase of the Property. As you know, Purchaser is obligated to pay the Purchase Price at a closing of the sale of the Property on February 1, 2023, pursuant to the Asset Purchase Agreement dated September 12, 2022 (the "APA"), and there is no financing contingency with respect to Purchaser's obligations. Mr. [K]ahanow has stated that Purchaser will not close as required on February 1, 2023, unless its request for a price adjustment of $1,500,000 is accepted by Seller.
>
> If Purchaser lacks ability to fund the entire Purchase Price; and/or Purchaser is not able to close on February 1, 2023, pursuant to the terms set forth in the APA; then these actions by and communications from Purchaser constitute a definite, specific, positive, and unconditional repudiation of Purchaser's obligations in accordance with the APA. Seller reserves all rights and remedies under the APA and applicable law, including but not limited to the right to terminate the APA and receive the entire amount of the deposit paid by Purchaser.
>
> Notwithstanding, if Purchaser has secured funding of the Purchase Price, and is prepared to close on February 1, 2023, contrary to Mr. [K]ahanow's statements; then I look forward to receiving your confirmation that Purchaser will close under the current terms of the APA, which confirmation I must receive in writing no later than 5 p.m. EST on January 13, 2023. If that is the case, I look forward to

> cooperating with you to close the sale of the
> Property on February 1, 2023. As you know, I
> have reached out regarding other outstanding
> items to be finalized prior to closing and I
> will be in touch regarding those items if
> confirmation is timely received.

(ECF No. 147-27).

On January 18, 2023, Purchaser's counsel sent Sellers'
counsel a letter stating, in relevant part:

> Seller's notice of default to Purchaser is
> completely without merit. The Default Letter
> relies on an email from Purchaser dated
> January 11, 2023 as the only support for
> Seller's assertion that Purchaser will not be
> able to meet its funding obligations at
> Closing. However, Purchaser never stated any
> inability to perform such Closing obligations
> nor has it stated its inability to fund the
> acquisition. Rather, the email merely refers
> to market conditions, etc. to explain
> Purchaser's business need for the request for
> a purchase price reduction. Seller's
> convoluted understanding of a communication
> from Purchaser does not obligate the Purchaser
> to respond to Seller's frivolous Notice
> Letter. Purchaser, therefore, explicitly
> rejects and repudiates Seller's claim of
> either breach or default.
>
> . . . .
>
> Purchaser remains willing to work through
> these issues and negotiate in good faith to
> ensure the transaction closes. Purchaser is
> hopeful that all issues can be remedied,
> resulting in a successful closing and a highly
> compatible future together for the parties as
> neighbors in the condominium on the property.

(ECF Nos. 115-25; 119-25).

On January 24, 2023, Sellers' counsel sent a letter to Purchaser's counsel stating that "Purchaser failed to timely cure any and all curable defaults in accordance with the terms of the APA; accordingly, Seller hereby TERMINATES the Asset Purchase Agreement[.]" (ECF No. 147-28, at 2).

On February 9, 2023, the chief financial officer of Purchaser's affiliate sent an email to Mr. Kahanow asking when the closing would take place. (ECF Nos. 115-2, at 3-4; 119-2). Mr. Kahanow responded that closing would occur on March 1, 2023. (ECF Nos. 115-2, at 2; 119-2). The chief financial officer replied, "We aren't really ready, any chance we can push off?" (*Id.*). Mr. Kahanow then stated, "If the deal stays alive which it looks like it will the only way they agree is if we close 3/1[.] Remember we were supposed to close 2/1 and I pushed it off to 3/1 to buy more time." (*Id.*).

The parties continued negotiating in February. Purchaser's counsel drafted an agreement (the "Side Agreement") providing that Sellers must return the $400,000 that Purchaser had deposited to escrow if the parties could not agree on an amendment to the APA. (ECF Nos. 147-13, at 4; 147-15, at 4-10). Both parties executed the Side Agreement on February 13, 2023. (ECF No. 22-7, at 2-4). On February 16, 2023, Sellers' counsel sent Purchaser's counsel a draft Second Amendment to the APA ("Second Amendment") which

included a plat with lot lines.  (ECF No. 147-13, at 2).  Purchaser never executed the Second Amendment.  (ECF No. 44-2 ¶ 7).

On February 22, 2023, Purchaser's lender, Popular Bank, issued credit approval.  (ECF Nos. 115-28; 119-28).  Popular Bank's corporate designee, Tyler Lipperman ("Mr. Lipperman") testified in his deposition that "[i]f we needed to have credit approval by the end of January, we would have tried to advance our process, but, to our knowledge, there was no timing pressure of, you know, the end of January, beginning of February."  (ECF Nos. 115-3, at 7; 119-3).

On March 1, 2023, Sellers filed suit in state court for injunctive relief and breach of contract.  (ECF No. 3, at 2-3, 9).  Purchaser removed the action to this court the next day.  (ECF No. 1, at 5).  Since then, Sellers have amended their complaint twice, (ECF Nos. 17; 48), and Purchaser has asserted counterclaims, (ECF No. 22).

On August 16, 2023, Sellers filed a proposed joint confidentiality and protective order, which allows the parties to designate certain materials to be exchanged in discovery as "Confidential" or "For Attorneys' Eyes Only" and requires the parties to file any such material under seal.  (ECF No. 66).  On August 17, 2023, the court approved the proposed order.  (ECF No. 69).  The court ordered that "whenever materials subject to the confidentiality order (or any paper referring to them) are

9

proposed to be filed in the court record under seal, the party making such filing must simultaneously submit a motion and accompanying order" explaining why the sealing complies with Local Rule 105.11. (*Id.*).

On June 1, 2023, Purchaser filed a motion for summary judgment on Count III of the counterclaim (Breach of the Side Agreement). (ECF No. 44). On December 18, 2023, the court granted Purchaser's motion as to the breach, but deferred entry of judgment because the parties had not addressed whether Rule 54(b) certification was appropriate. (ECF Nos. 87; 88).

On February 17, 2024, Sellers filed a motion for partial summary judgment on Count I of the counterclaim (Breach of Contract-Specific Performance of the APA) and moved to seal the entire motion and supporting memorandum and exhibits. (ECF Nos. 115; 116). On February 22, 2024, the court denied the motion to seal because Sellers "made no attempt to redact portions of the filings as opposed to sealing the documents in their entirety." (ECF No. 118, at 3).

That same day, Sellers filed another version of their motion for partial summary judgment on Count I of the counterclaim, this one with redactions, (ECF No. 119), and an amended motion to seal the first version of the motion, (ECF No. 120). This time Sellers sought to seal only the redacted portions of their motion, memorandum, and exhibits containing references to materials that

10

one of the parties labelled "Confidential" or "For Attorneys' Eyes Only."[2]  (ECF No. 120, at 2).  On March 8, 2024, Purchaser filed an opposition and cross-motion for summary judgment on Count I of the counterclaim.  (ECF No. 128).  On March 11, Purchaser then filed a motion to amend its opposition and cross-motion, an amended opposition and cross-motion for summary judgment on Count I of the counterclaim, and a motion to seal the entire motion and supporting memorandum and exhibits.  (ECF Nos. 136; 137; 138).  On March 22, 2024, Sellers filed two versions of a reply and opposition to Purchaser's amended opposition and cross-motion for summary judgment—one with redactions and one sealed—and moved to seal portions of the opposition/reply and accompanying exhibits.[3]  (ECF Nos. 143; 144; 145).  On March 25, 2024, the court granted Purchaser's motion to amend its opposition and cross-motion for summary judgment on Count I of the counterclaim.  (ECF No. 146).  That same day, Purchaser filed another version of the amended opposition and cross-motion for summary judgment with some redactions, which is currently pending.  (ECF No. 147).

---

[2] Sellers state that they seek to seal only the redacted portions meaning that they request to seal the original unredacted filing, ECF No. 115.

[3] Again, Sellers' motion is to seal the unredacted version, ECF No. 144.

On March 9, 2024, Purchaser filed a motion for summary judgment on Counts II and III of the counterclaim. (ECF No. 129). Purchaser then filed a motion to amend its motion on March 11, 2024, (ECF No. 139), which the court granted on March 25, 2024, (ECF No. 146). That same day, Purchaser filed an amended motion for summary judgment on Counts II (Anticipatory Breach of the APA) and III (Breach of the Side Agreement) of the counterclaim. (ECF No. 148). Meanwhile, on March 22, 2024, Sellers filed two versions of their opposition to Purchaser's amended motion for summary judgment on Counts II and III of the counterclaim—one with redactions and one under seal—and moved to seal portions of its opposition and accompanying exhibits.[4] (ECF Nos. 140; 141; 142).

## II. Motions to Seal

The United States Court of Appeals for the Fourth Circuit has reminded us that:

> It is well settled that the public and press have a qualified right of access to judicial documents and records filed in civil and criminal proceedings. *See Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 580 n.17, 100 S.Ct. 2814, 65 L.Ed.2d 973 (1980); *Nixon v. Warner Communications, Inc.*, 435 U.S. 589, 597, 98 S.Ct. 1306, 55 L.Ed.2d 570 (1978); *Media Gen. Operations, Inc. v. Buchanan*, 417 F.3d 424, 428 (4th Cir. 2005). The right of public access springs from the First Amendment and the common-law tradition that court proceedings are presumptively open to public scrutiny. *Va. Dep't of State Police*

---

[4] Sellers' request is to seal the unredacted version, ECF No. 141.

*v. Wash. Post*, 386 F.3d 567, 575 (4th Cir. 2004).  "The distinction between the rights of access afforded by the common law and the First Amendment is significant, because the common law does not afford as much substantive protection to the interests of the press and the public as does the First Amendment."  *In re United States for an Order Pursuant to 18 U.S.C. Section 2703*, 707 F.3d 283, 290 (4th Cir. 2013) (quoting *Va. Dep't of State Police*, 386 F.3d at 575) (internal quotation marks omitted).  The common-law presumptive right of access extends to all judicial documents and records, and the presumption can be rebutted only by showing that "countervailing interests heavily outweigh the public interests in access."  *Rushford* [*v. New Yorker Mag., Inc.*], 846 F.2d [249,] 253 [(4th Cir. 1998)].  By contrast, the First Amendment secures a right of access "only to particular judicial records and documents," *Stone* [*v. Univ. of Marland Med. Sys. Corp.*], 855 F.2d [178,] 180 [(4th Cir. 1998)], and, when it applies, access may be restricted only if closure is "necessitated by a compelling government interest" and the denial of access is "narrowly tailored to serve that interest," *In re Wash. Post Co.*, 807 F.2d 383, 390 (4th Cir. 1986) (quoting *Press-Enter. Co. v. Superior Court*, 464 U.S. 501, 510, 104 S.Ct. 819, 78 L.Ed.2d 629 (1984) (internal quotation marks omitted)).

*Doe v. Pub. Citizen*, 749 F.3d 246, 265-66 (4th Cir. 2014).  The

*Public Citizen* court also explained that:

When presented with a motion to seal, the law in this Circuit requires a judicial officer to comply with the following procedural requirements:  (1) provide public notice of the sealing request and a reasonable opportunity for the public to voice objections to the motion; (2) consider less drastic alternatives to closure; and (3) if it determines that full access is not necessary, it must state its reasons—with specific

13

> findings—supporting closure and its
> rejections of less drastic alternatives.

*Id.* at 272 (citing *In re Knight Pub. Co.*, 743 F.2d 231, 234–35 (4th Cir. 1984)); *see also Ashcraft v. Conoco, Inc.*, 218 F.3d 288, 302 (4th Cir. 2000). In addition, Local Rule 105.11 requires the party seeking sealing to include "(a) proposed reasons supported by specific factual representations to justify the sealing and (b) an explanation why alternatives to sealing would not provide sufficient protection."

Even where, as here, the parties have agreed to a pretrial discovery protective order, the Fourth Circuit has ruled that "once the documents [are] made part of a dispositive motion [such as one for summary judgment], they los[e] their status as being 'raw fruits of discovery,' and that discovery, 'which is ordinarily conducted in private, stands on a wholly different footing than does a motion filed by a party seeking action by the court.'" *Virginia Dep't of State Police v. Washington Post*, 386 F.3d 567, 576 (4th Cir. 2004) (quoting *Rushford v. New Yorker Mag., Inc.*, 846 F.2d 249, 252 (4th Cir. 1988)). Thus, a protective order is "not sufficient, by itself, to justify the continued sealing of filings in court." *Chaplick v. Jeng Fen Mao*, No. 13-cv-2070-PWG, 2014 WL 884069, at *3 (D.Md. Mar. 5, 2014).

The motions to seal will be granted. Sellers' motion to seal the motion for partial summary judgment has been pending on the

docket for almost four months, Purchaser's motion has been pending for over three months, and Sellers' other two motions have been pending for almost three months.  No objection to sealing has been filed.

No less drastic alternatives to sealing exist.  As for Sellers' motion to seal the motion for partial summary judgment, the court has already required Sellers to find a less drastic alternative to sealing the entire motion, memorandum, and exhibits, (ECF No. 118), and Sellers have done so by filing a version that redacts only portions of the filings, (ECF No. 120).  As for Sellers' other two motions, Sellers have redacted portions instead of requesting sealing of the entire filing.  (ECF Nos. 142; 145).  Purchaser has also redacted portions of its amended opposition and cross-motion for summary judgment instead of requesting sealing of its entire filing, although it seeks to seal completely two exhibits—Exhibits 9 and 15—which do not appear in the redacted version.  Exhibit 9 contains Sellers' board meeting minutes and Exhibit 15 contains a table that appears to display the amount of money Sellers spent with respect to various classifications of nurses for five consecutive months.  (ECF Nos. 137-4; 137-6).  Both the board minutes and the table contain sensitive information such that their disclosure would risk harm to the parties that outweighs the potential public interest in access.  The redacted portions in all four motions are modest.

*See Charter Oak Fire Ins. Co. v. Am. Cap., Ltd.*, No. 09-cv-0100-DKC, 2015 WL 1242684, at *3 (D.Md. Mar. 17, 2015). Thus, the redactions (and in Purchaser's case, the sealing of two exhibits) are satisfactory alternatives to sealing the entire filings.

That the proposed redactions contain information designated by the parties as "Confidential" and "For Attorneys' Eyes Only" under the confidentiality order alone is insufficient to justify sealing. A review of the proposed redactions, however, indicates that they relate to sensitive topics such as the purchase price, parcel characteristics, employee and resident information, inspection and permit information, assumption of contracts, negotiations as to sensitive terms, a possible delay of the closing date, agency usage details, a possible deal with another purchaser, and discussion topics at Sellers' board meeting, as well as Purchaser's bank financing, internal structure, financial condition, assets, ability to fund the transaction, retention of counsel, statements regarding timing of closing, and lender's statements. (*See* ECF Nos. 115; 119; 137; 140; 141; 143; 144; 147). Absent the proposed redactions, the parties would be hard-pressed to support their motions properly without violating the confidentiality order, and confidential information about both parties would be revealed.

Disclosure of the information risks prejudice to the parties that outweighs any public interest in access. The motions to seal

16

the unredacted versions, (ECF Nos. 115; 137; 141; 144), will be granted and the redacted versions, (ECF Nos. 119; 140; 143; 147), will remain public.

## III. Motions for Summary Judgment

Parties "may file a motion for summary judgment at any time until 30 days after the close of all discovery."  Fed.R.Civ.P. 56(b).  A court may grant summary judgment if there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law.  Fed.R.Civ.P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Emmett v. Johnson*, 532 F.3d 291, 297 (4th Cir. 2008).  Where, as here, cross-motions for summary judgment have been filed, a court must "evaluate each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration[.]"  *Bollech v. Charles Cnty., Md.*, 69 F.App'x 178, 180 (4th Cir. 2003) (citing *Mingus Constructors, Inc. v. United States*, 812 F.2d 1387, 1391 (Fed.Cir. 1987)).  "[T]he nonmoving party nonetheless must offer some 'concrete evidence from which a reasonable juror could return a verdict in his [or her] favor.'"  *Williams v. Genex Servs., LLC*, 809 F.3d 103, 109 (4th Cir. 2015) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986)).

**A. Cross Motions for Summary Judgment on Count I of the Counterclaim**

In Count I of the Counterclaim, Purchaser alleges, in part, that Sellers breached the APA by:  (1) failing to operate the nursing home facility consistent with its operation in September 2022; (2) intentionally impairing Purchaser's license approval; (3) failing to apply for and obtain the condominium approval as required by the APA; (4) failing to deliver to Purchaser an appraisal for the South Wooded Parcel; and (5) failing to convey the Property and Facility to Purchaser.  (ECF No. 22, at 12). Purchaser seeks specific performance, an injunction that prohibits Sellers from breaching the APA and from selling or transferring the Property until this litigation is resolved, and damages. (*Id.* at 12-13).

Sellers seek partial summary judgment on the portion of Count I of the counterclaim requesting specific performance of the APA. They argue that Purchaser is not entitled to specific performance because: (1) Purchaser was not ready and able to perform; (2) the parties did not agree to terms that would govern the condominium regime; and (3) the parties did not agree on definite lot lines. (ECF Nos. 115-1, at 23; 119-1, at 23).

Purchaser also seeks summary judgment on Count I of the counterclaim, arguing that: (1) Sellers committed multiple material breaches of the APA; (2) it is ready and able to perform;

(3) finalized condo agreements are not required to grant specific performance; and (4) the APA and agreed-upon plat supply a reasonably certain description of the property.  (ECF Nos. 137, at 13, 21, 26, 31; 147, at 12, 20, 25, 30).

To succeed in a claim for breach of contract under Maryland law, a party must prove that it performed its obligations under the contract, the other party owed a contractual obligation, and the other party materially breached its obligation.  *Fenzel v. Grp. 2 Software, LLC*, No. 13-cv-0379-DKC, 2016 WL 865363, at *5 (D.Md. Mar. 7, 2016) ("Under Maryland law, to establish breach of contract, a plaintiff must prove that the defendant owed the plaintiff a contractual obligation and that the defendant materially breached that obligation."); *Geoghegan v. Grant*, No. 10-cv-1137-DKC, 2011 WL 673779, at *9 (D.Md. Feb. 17, 2011) ("To succeed in a claim for breach of contract under Maryland law, a party must prove that the other party owed a contractual obligation and that the other party breached that obligation."); *KVC Waffles Ltd. v. New Carbon Co., LLC*, No. 20-cv-195-LKG, 2022 WL 2919677, at *3 (D.Md. July 22, 2022), *aff'd*, No. 22-1746, 2023 WL 7688304 (4th Cir. Nov. 15, 2023) (citing *Hubler Rentals, Inc. v. Roadway Exp., Inc.*, 637 F.2d 257, 260-61 (4th Cir. 1981); *Fox v. Dynamark Sec. Ctrs., Inc.*, 885 F.2d 864 (Table), (4th Cir. Sept. 1, 1989)) ("The Fourth Circuit has held that performance of a

contract by the party filing suit is a condition precedent to recovery under Maryland law.").

In certain cases, specific performance may be the proper remedy for a breach of contract.  To qualify for specific performance, a party must demonstrate a contractual obligation and corresponding breach. *Fenzel*, 2016 WL 865363, at *16; *Geoghegan*, 2011 WL 673779, at *9.  A court may award specific performance "in an appropriate case on the basis of the strength of the circumstances and equities of each party."  *Namleb Corp. v. Garrett*, 149 Md.App. 163, 174 (2002) (citing *Zouck v. Zouck*, 204 Md. 285, 104 A.2d 573, 577 (1954)).  Although specific performance is generally considered an extraordinary equitable remedy, it "has been particularly recognized as appropriate where the contract is for the sale of land because of the presumed uniqueness of land itself, no parcel being exactly like another." *Cattail Assocs., Inc. v. Sass*, 170 Md.App. 474, 500–501 (2006) (quoting *Archway Motors, Inc. v. Herman*, 37 Md.App. 674, 681 (1977)).

As will be discussed, Sellers' motion cannot be granted because they have not shown indisputably that Purchaser repudiated the deal and would have been unable to consummate the purchase. Purchaser similarly has not shown, as a matter of law, that Sellers breached the APA or that, in any event, it is entitled to specific performance.  Thus, its cross-motion must be denied in its

entirety.  Nevertheless, a subsidiary issue raised by these motions can be resolved under Fed.R.Civ.P. 56(g).

To defeat Purchaser's claim for specific performance, Sellers must prove that Purchaser has not met at least one of the required elements for specific performance.  The required elements for specific performance are as follows:  "(1) a valid contract exists; (2) the party is ready, willing, and able to perform; and (3) the balance of the equities tips in favor of the party seeking performance."  *Bresler v. Wilmington Tr. Co.*, No. 09-cv-2957-PJM, 2015 WL 1402377, at *25 (D.Md. Mar. 25, 2015), *amended in part*, No. 09-cv-2957-PJM, 2015 WL 4385994 (D.Md. July 10, 2015) (quoting *Corkscrew Min. Ventures Ltd. v. Preferred Real Estate Inv., Inc.*, No. 11-cv-704470-VCP, 2011 WL 704470, at *6 (Del.Ch. Feb. 28, 2011)); *see also Geoghegan*, 2011 WL 673779, at *9 (quoting *Nat'l Micrographics Sys., Inc. v. OCE-Indus., Inc.*, 55 Md.App. 526, 545 (Md.App. 1983)) ("[O]ne party may not recover from another party under a contract unless the former has performed or is ready and willing to perform."); *Cutler v. Sugarman Org., Ltd.*, 88 Md.App. 567, 586 (1991) (quoting *Clayten v. Proutt*, 227 Md. 198, 203 (1961)) ("[O]ne who seeks specific performance must be able to show that 'he is ready and desirous to comply with the contract on his part, and has the ability to perform.'").

Additionally, specific performance may only be granted "when an agreement is clear and definite and a court does not need to

supply essential contract terms." *Bresler*, 2015 WL 1402377, at *25; *see also Beck v. Bernstein*, 198 Md. 244, 249 (1951) ("The chancellor cannot grant the specific performance of an alleged contract unless it is so clear, definite and convincing as to leave no reasonable doubt as to the existence of the contract and its terms. If the contract is uncertain or ambiguous, it will not be specifically enforced."); *Trotter v. Lewis*, 185 Md. 528, 532 (1946) ("[T]he court will not decree specific performance of a contract unless it is definite and certain in all its terms and free from all ambiguity.").

Finally, a court can only award specific performance of a contract for the sale of real property if "the description (of the land used in the contract) [] be such as to enable the court to determine with certainty, with the aid of such extrinsic evidence as is admissible under the rules of evidence, what property was intended by the parties to be covered thereby." *Martin v. Michaels*, 259 Md. 346, 349 (1970) (quoting *Powell v. Moody*, 153 Md. 62, 137 A. 477, 478 (1927)). "The description need not be given with such particularity as to make a resort to extrinsic evidence unnecessary. Reasonable certainty is all that is required." *Id.* at 349-50 (quoting *Powell*, 137 A. at 478). "The courts cannot supply a description of land where the parties by their own contract have f[a]iled to do so." *Id.* at 352 (citing *Bellevue Club v. Punte*, 148 Md. 589, 602 (1925)).

**1. Whether Purchaser Was Ready and Able to Perform**

Sellers first contend that the court cannot award specific performance because Purchaser was not ready and able to perform its contractual duties under the APA. (ECF Nos. 115-1, at 24-25; 119-1, at 24-25). Specifically, they argue that: (1) Mr. Kahanow stated that he took purposeful action to push off closing, Purchaser's chief financial officer Mindee Posen ("Ms. Posen") stated that "[w]e aren't really ready" for closing, and Purchaser's owner Yitz Rokowsky ("Mr. Rokowsky") stated that he wanted to push off closing by a year; and (2) Purchaser did not have financing in place until February 22, 2023. (*Id.*).

Purchaser, on the other hand, argues it remained ready and able to perform because:  (1) it never stated it would not or could not close the transaction on February 1, 2023, and expressly refuted Sellers' misrepresentation that it would not close by that date; (2) it had no knowledge that Popular Bank would not approve its loan by February 1, 2023; (3) it always had the ability to pay the purchase price with alternative funds to bank financing; and (4) the APA did not require it to provide Sellers with proof of funds before closing.  (ECF Nos. 137, at 31-33; 147, at 30-32).

Sellers reply that no contemporaneous evidence supports Purchaser's contention that it was contemplating closing the transaction with cash. (ECF No. 144, at 15-16). Purchaser replies that Mr. Kahanow's email in which he stated he took action to push

off closing was sent weeks *after* Sellers purported to terminate the APA, and there is no evidence that his actions occurred in January.  (ECF No. 149, at 11).

Questions of material fact exist as to whether Purchaser was ready, willing, and able to close on February 1, 2023.  The evidence reflects both that Purchaser never stated outright that it would not or could not close by February 1 *and* that Purchaser's officers made statements that they were not ready for closing or wanted to push off closing.  (ECF Nos. 115-2, at 2-6; 115-23, at 2; 119-2; 119-23).  Likewise, the evidence reflects both that Purchaser could not have closed by February 1, 2023 with financing from Popular Bank *and* that its affiliates possessed the purchase price in cash.  (ECF Nos. 115-27, at 2; 115-28, at 2-4; 119-27; 119-28; 147-11, at 2-3; 147-24, at 10).  Purchaser submits a declaration from the CEO of one of its affiliates stating that Purchaser, through its affiliates, "had access to funds to pay the full purchase price[.]"  (ECF No. 147-11, at 2).  Whether Purchaser's affiliate would have actually authorized Purchaser to use the cash, however, is unclear.  Moreover, the APA does not require Purchaser to provide proof of financing.  (ECF Nos. 115-9, at 3-44; 119-9, at 3-44).  Because issues of material fact remain as to whether Purchaser was ready, willing, and able to close the deal timely, Sellers have not shown that Purchaser cannot satisfy the elements of specific performance.  Nor has Purchaser

shown as a matter of law that it has satisfied the element of specific performance requiring it to be ready, willing, and able to close the transaction by February 1, 2023. Accordingly, Purchaser is not entitled to specific performance.

**2. Whether the Parties Agreed to Condominium Terms**

Next, Sellers assert that the purchase of some, but not all, of the 16-acre property required the parties to agree to a land condominium regime to avoid having to subdivide the property, and that the APA lacked agreement on material condominium terms such as development rights, budget, allocation of common area maintenance fees, control over the designation of a manger for the condominium, expansion of units, voting rights, and resale requirements. (ECF Nos. 115-1, at 27; 119-1, at 27). They argue that to grant specific performance, the court would have to impose its own judgment as to condominium terms. (ECF Nos. 115-1, at 29; 119-1, at 29).

Purchaser, in turn, contends that it does not seek enforcement of a previously agreed-upon condominium regime, but rather seeks enforcement of the APA, which requires Sellers to obtain condominium approval and negotiate in good faith. (ECF Nos. 137, at 27; 147, at 26). It argues that: (1) completion of the Condo Agreements as a closing condition does not render the APA unenforceable because the industry standard is to require parties to complete such agreements post-execution; and (2) any items left

25

open under the Condo Agreements are not essential terms, and indeed the APA and Sellers' proposed Second Amendment identify the material terms.  (ECF Nos. 137, at 27-31; 147, at 28-30).

Sellers reply that the APA lacks essentially any terms that would be necessary to understand how the proposed condominium land units would operate and what rules would govern them, and that Purchaser cannot use the February 2023 settlement agreement to establish an enforceable APA as of September 2022.  (ECF No. 144, at 12-14).  Purchaser replies that the parties agreed on the essential terms in the APA and left the details of the condominium regime for closing.  (ECF No. 149, at 8-10).

The APA requires the parties to create the Condo Agreements "as a condition to Closing of the transaction contemplated by" the APA.  (ECF Nos. 115-9, at 24; 119-9, at 24).  The APA provides that the Condo Agreements shall include the "condominium plat, master deed, by-laws and other documents" and that the terms must address "easements for access, parking, drainage, utilities, identification sign, and other matters as well as cost sharing provisions related thereto as well as the Restrictive Covenants and Right of First Refusal . . . and the Subdivision Covenant" and "a revised legal description for the Purchaser's Real Property." (*Id.*).  As Purchaser points out, it is not uncommon for valid contracts to exclude immaterial terms and allow the parties to agree on them in the future.  *Falls Garden Condo. Ass'n, Inc. v.*

*Falls Homeowners Ass'n, Inc.*, 441 Md. 290, 305 (2015) (quoting 1 Joseph M. Perillo, *Corbin on Contracts*, § 2.8, p. 138 (Rev. ed. 1993)) ("Every possible term does not need to be included, however, because '[e]ven though certain matters are expressly left to be agreed upon in the future, they may not be regarded by the parties as essential to their present agreement.'").

Although Purchaser's expert admitted that he viewed the condominium regime as a material term in the context of the APA, he also stated that it is consistent with industry practice for the APA to require the parties to complete the Condo Agreements post-execution as a closing condition. (ECF Nos. 115-5, at 9; 119-5, at 9; 147-8, at 3-4). Purchaser's expert also did not state whether or not the parties believed the condominium regime was essential to the APA. Because issues of fact remain as to whether the condominium regime was an essential term of the APA, Sellers have not shown that the APA is so unclear or indefinite that the court would need to supply essential terms. Nor has Purchaser shown as a matter of law that the APA is so clear and definite as to justify specific performance.

### 3. Whether the Parties Agreed on a Reasonably Certain Description of the Property

Finally, Sellers assert that the court cannot grant specific performance because the parties never agreed on definite boundaries of the property to be conveyed. (ECF Nos. 115-1, at

29-30; 119-1, at 29-30).  They argue that the August 25, 2022 proposal does not constitute an enforceable agreement on lot lines because the parties continued negotiating the boundaries for the next six months.  (*Id.* at 30).  They also contend that Purchaser cannot argue that the February 2023 agreement to reinstate the APA contains enforceable lot lines because Purchaser has already prevailed on its argument that the February 2023 agreement is not enforceable.  (*Id.* at 31-32).

Purchaser asserts that the property description in the APA and agreed-upon plat in the Second Amendment suffice to award specific performance, and that the APA only required the parties to agree on the plat before closing, which has not yet occurred. (ECF Nos. 137, at 22-26; 147, at 21-25).

Sellers reply that: (1) an agreement to agree does not constitute a valid contract; (2) Purchaser is estopped from relying on the unexecuted Second Amendment because it previously argued the Second Amendment was not enforceable; and (3) the Second Amendment is inadmissible under Federal Rule of Evidence 408 as a settlement communication.  (ECF No. 144, at 7).

Purchaser replies that Sellers failed to address Purchaser's argument that the parties agreed on the lot lines contained in the February 2023 plat, and therefore conceded the point.  (ECF No. 149, at 2).  Purchaser also argues that the court should consider the February 2023 plat as extrinsic evidence of the

property included in the sale because:  (1) pursuant to Rule 408,
Purchaser offers the plat to show intent, not to prove liability
or damages; (2) equitable estoppel does not apply because Purchaser
does not seek to enforce the proposed Second Amendment; (3) even
though the parties created the plat post-APA execution, they
understood when signing the APA that they would later agree on a
plat to more precisely define the property.  (ECF No. 149, at 2-
6).  Finally, Purchaser asserts that even if the court disregards
the plat, additional extrinsic evidence including the LOI, pre-
APA discussions, and Sellers' testimony confirm that the parties
agreed on the property included in the transaction.  (ECF No. 149,
at 7).

The APA describes the Property as follows:

> Real Property Seller is the owner of the real
> property located at 10200 La Plata Road, 10200
> La Plata, Maryland 20646, as more particularly
> described on Exhibit A attached hereto and
> made a part hereof (the "Land") together with
> all the tenements, hereditaments, easements,
> rights-of-way and appurtenances belonging or
> in any way appertaining to the same; and (ii)
> all buildings and improvements on the Land
> (the "Improvements" and, together with the
> Land collectively, the "Real Property"); and

> [] the Old Operator leases the Real Property
> from Seller and is the licensed operator of a
> 170 bed skilled nursing facility located and
> operated at the Real Property, commonly known
> as Sagepoint Senior Living Services (the
> "Facility")

> . . . .

> Real Property Seller agrees to sell to
> Purchaser, and Purchaser agrees to purchase
> from Real Property Seller, upon the terms and
> conditions hereinafter set forth, all of
> Seller's right, title and interest in and to
> the Real Property.

(ECF Nos. 115-9, at 3; 119-9, at 3). The APA also provides that "[u]pon the completion of the Condominium, Seller and Purchaser shall agree on a revised legal description for the Purchaser's Real Property to reference the Condominium and the units being conveyed which shall be included in this Agreement as Exhibit A-2 which shall be the property conveyed to the Purchaser at closing." (ECF Nos. 115-9, at 24; 119-9, at 24). Exhibits A and A-2 are blank. (ECF Nos. 115-9, at 45; 119-9, at 45).

To determine whether the parties agreed on a revised legal description of the property in Sellers' February 2023 proposed Second Amendment, it is necessary to look to the parties' counsel's emails.[5] On February 10, 2023, Sellers' counsel emailed Purchaser's counsel stating that "[t]he parties are not agreed on the 180' buffer." (ECF No. 147-13, at 9). Purchaser's counsel responded, "In the interest of reaching an agreement so this can close on time, we propose the attached lot line compromise. The blue is your proposal, the green was our proposal. We are willing

---

[5] Federal Rule of Evidence 408 does not preclude consideration of counsels' emails because they are used to show intent, not "to prove or disprove the validity or amount of a disputed claim or to impeach by a prior inconsistent statement or a contradiction."

to meet in the middle with the red line." (*Id.* at 8).  Later that day, Sellers' counsel responded, "Seller will accept the request for the 90' addition into Lot one as you describe on the attached image (red line)." (*Id.* at 7).  Thus, although Purchaser did not execute the Second Amendment, Sellers have not demonstrated that no questions of material fact remain as to whether the parties agreed on lot lines.

On the other hand, a reasonable factfinder could determine that because Purchaser failed to execute the Second Amendment, the parties could not have reached agreement on lot lines.  As the court found in a prior opinion, the parties "clearly intended to reach agreement [on the Second Amendment], if at all, in the form of a complete written document signed by all parties." (ECF No. 87, at 13).  Purchaser cannot rely on lot lines to which the parties did not plainly agree.  Hence, Purchaser has also not demonstrated that the property to be conveyed can be described with reasonable certainty, and therefore has failed to demonstrate its entitlement to specific performance.

To summarize, Sellers have not shown that Purchaser cannot succeed on its claim for specific performance, and Purchaser has not shown as a matter of law that it is entitled to specific performance.  Because neither side has shown that the question of specific performance should be settled on summary judgment, both

motions for summary judgment on Count I of the counterclaim will be denied as to specific performance.

### 4. Breach of the APA

Even though the relief of specific performance is unavailable on summary judgment, the remaining portion of Purchaser's motion, asserting that Sellers materially breached the APA, can be addressed to determine whether any material fact is not genuinely in dispute and is established in the case. Purchaser contends that Sellers breached the APA by: (1) failing to submit documentation and apply for condominium approval within 30 days after APA execution; (2) failing to operate and maintain the Facility consistent with conditions at the time of APA execution; (3) taking action to interfere with Purchaser's license approval; (4) failing to deliver an appraisal of the South Wooded Parcel; (5) failing to deliver the Facility to Purchaser; and (6) failing to negotiate in good faith to execute the Condo Agreements. (ECF Nos. 137, at 13-21; 147, at 12-19). Sellers reply that material disputes of fact exist regarding which party breached the APA first. (ECF Nos. 143, at 18; 144, at 18).

### a. Condominium Approval

Purchaser first contends that Sellers breached the APA by circulating the draft documents necessary for condominium approval eight days after the deadline. (ECF Nos. 137, at 13; 147, at 12).

Sellers assert that their delay did not constitute a material breach:

> Sellers only sent the documents about one week late, in the context of a closing that would not occur for months; Sellers notified the Purchaser before the drafts were due the drafts would be slightly late; Purchaser never once asked for the drafts before they were circulated; Sellers emailed the Purchaser multiple times to confirm Purchaser had in fact waived the 30-day requirement; Purchaser never told Sellers were in breach of this obligation until after Sellers already defaulted Purchaser; and Purchasers then dragged its feet and prevented Sellers from finalizing the very same documents Purchaser now tries to claim were untimely.

(ECF Nos. 144, at 18; 143, at 18).  Sellers also argue that Purchaser waived their obligation to obtain full condominium approval within 30 days of execution.  (*Id.* at 18-19).

Section 14(q) of the APA provides that "[n]o later than 30 days following the Effective Date, Seller[s] shall apply for and obtain all necessary approvals ("Condominium Approval") to create a land condominium for the Real Property[.]"  (ECF Nos. 115-9, at 24; 119-9, at 24).  The effective date was September 12, 2022, (ECF Nos. 115-9, at 3; 119-9, at 3), creating a deadline of October 12, 2022.  It is undisputed that Sellers did not circulate the draft condominium documents until October 20, 2022. (ECF Nos. 115-15, at 8; 119-15, at 8; 147-4, at 33-34).  If Purchaser waived performance of Sellers' obligation, however, Sellers' delay would not constitute a breach.  Waiver is "the intentional relinquishment

of a known right, or such conduct as warrants an inference of the relinquishment of such right, and may result from an express agreement or be inferred from circumstances." *Cain v. Midland Funding, LLC*, 452 Md. 141, 161 (2017) (quoting *Hovnanian Land Inv. Grp., LLC v. Annapolis Towne Ctr. at Parole, LLC*, 421 Md. 94, 122 (2011)).  Sellers notified Purchaser that the drafts would be late (albeit after the deadline passed) and Purchaser did not respond to the drafts despite Sellers' reminders from November through January.  (ECF Nos. 115-15, at 3; 115-16, at 2, 4; 115-18, at 2; 115-19, at 2-3, 5, 7; 115-20, at 2-4, 6-8; 115-22, at 2; 119-15, at 3; 119-16; 119-18; 119-19; 119-20; 119-22).  A question of material fact exists as to whether Purchaser waived strict performance of Sellers' obligation to apply for and obtain approvals for the condominium documents within 30 days.

Even if Purchaser did not waive the obligation, a genuine dispute of fact remains as to whether Sellers' breach was material. "A breach is material when it 'is such that further performance of the contract would be different in substance from that which was contracted for.'" *Barufaldi v. Ocean City, Chamber of Com., Inc.*, 196 Md.App. 1, 23 (2010) (quoting *Dialist Co. v. Pulford*, 42 Md.App. 173, 178 (1979)).  Whether a breach is material is ordinarily a question of fact, although "[t]here are instances . . . when the issue is so clear that it may be decided as a matter of law." *Id.*  Purchaser has not shown that an eight-

day delay in the context of a closing months away would have caused further performance of the APA to be different in substance from that for which the parties contracted, especially when Purchaser waited for weeks to respond to the drafts.  Thus, Purchaser has not proven that no question of material fact exists as to whether Sellers *materially* breached the APA by circulating the draft documents necessary for condominium approval eight days after the deadline.

### b. Operation of the Facility

Second, Purchaser asserts that Sellers breached the APA by: (1) increasing agency usage (*i.e.*, temporary staff); (2) decreasing direct patient care hours; and (3) contracting with a new facility to transfer operations and making efforts to hire key personnel without Purchaser's approval.  (ECF Nos. 137, at 13-16; 147, at 12-15).

Sellers insist that they did not breach with respect to post-APA operations.  They contend that increasing agency usage did not constitute a breach because the APA does not require Sellers to maintain identical staffing and patient care ratios as of the execution date, and Sellers did not deviate from past practice in hiring agency nurses.  (ECF No. 144, at 21-25).  They argue that they did not breach by decreasing patient quality of care because: (1) the APA does not require Sellers to maintain any specific patient quality of care; (2) they actually improved the quality of

care as evidenced by their "star" rating increasing from three to four stars out of five; and (3) a decrease in direct patient care hours does not necessarily result in a decrease of overall care. (*Id.* at 24-27).   They do not respond to Purchaser's argument regarding their contracting with a new facility to transfer operations and making efforts to hire key personnel without Purchaser's approval.

The APA requires Sellers to "continue to operate and maintain the Property and the Facility . . . consistent with its operation and maintenance at the time of execution of" the APA.   (ECF Nos. 115-9, at 20; 119-9, at 20).   With respect to agency usage, the APA provides that Sellers must "continue to hire employees to the extent necessary to operate the Facility in accordance with past practices[.]" (ECF Nos. 115-9, at 21; 119-9, at 21).   It is undisputed that agency usage increased between September 2022 and January 2023, but Purchaser has not shown that such an increase constitutes a failure to operate the Facility in accordance with past practices.   (ECF Nos. 137-6, at 2; 137-7, at 3; 147-17, at 3; 147-18, at 6).   Indeed, Sellers have put forth evidence that a national nursing shortage occurred in fall 2022 and that they continued their hiring practices in accordance with how they had operated in the past.   (ECF No. 143-3, at 5-7).

Regarding direct patient care hours, the APA does not specifically require Sellers to maintain direct patient care hours

or to maintain the same quality of care.   The evidence is uncontroverted that total direct patient care hours decreased from 3.32 hours per day in quarter three of 2022 to 3.16 hours per day in quarter two of 2023.   (ECF No. 147-18, at 3-4).   Although Purchaser's expert stated that this decrease could affect the quality of patient care, she also conceded that it amounted to only a few minutes per patient per day, and that a decrease in quality of care is not automatic.   (ECF No. 147-20, at 4-5). Moreover, Sellers have proffered evidence that they increased the quality of patient care, as their "star" rating increased from three to four stars out of five in 2023.   (ECF No. 143-7, at 5, 6).

Not only has Purchaser failed to demonstrate that Sellers materially breached the APA by decreasing patient care hours, but Purchaser *cannot* succeed on this argument because the APA does not require Sellers to maintain direct patient care hours or to maintain the same quality of care.   Indeed, the obligation to "maintain the Property and the Facility . . . consistent with its operation and maintenance at the time of execution" pertains to "the personal property, fixtures, equipment and systems necessary to operate the Facility, including but not limited to the HVAC, electrical and plumbing systems[,]" not to patient care.   (ECF Nos. 115-9, at 20; 119-9, at 20).   Section 14(a) does require Sellers to "take all commercially reasonable actions consistent

37

with past practices intended to preserve the present residency occupancy levels" and to "retain the goodwill with all of the . . . residents . . . in a manner consistent with past practices." (*Id.* at 21).   These obligations, however, do not require Sellers to maintain direct patient care hours.   Thus, although Sellers have not requested summary judgment on this issue,[6] partial summary judgment will be entered in Sellers' favor on a sub-portion of the portion of Count I of the counterclaim that alleges that Sellers breached the APA by failing to operate the Facility consistent with its operation in September 2022.   (ECF No. 22 ¶¶ 56, 57).   Specifically, Sellers will be granted partial summary judgment on the sub-portion of the allegation (unstated in the counterclaim but argued in the motion) that Sellers breached the APA by decreasing direct patient care hours.

With respect to hiring, the APA provides that "Old Operator shall not hire any new property manager, administrator, director of nursing and the directors of sales and marketing without the consent of Purchaser which consent may not be unreasonable conditioned, withheld, or delayed[.]" (ECF Nos. 115-9, at 21; 119-

---

[6]   "District courts may enter summary judgment *sua sponte* so long as the losing party was on notice that she had to come forward with all of her evidence." *Velasquez v. Salsas & Beer Rest., Inc.*, 735 F.App'x 807, 809 (4th Cir. 2018) (quoting *Penley v. McDowell Cnty. Bd. of Educ.*, 876 F.3d 646, 661 (4th Cir. 2017)).   Here, Purchaser has had the opportunity to present evidence—and did present evidence—on the issue of whether the APA obligates Sellers to maintain direct patient care hours.

9, at 21).  The evidence reflects that Sellers contracted with a new operator, Green Tree, to take over operations of the Facility, and that Green Tree posted a job listing to hire a new administrator.  (ECF Nos. 137-2, at 26-27; 147-2, at 26-27; 147-23, at 2).  Sellers do not dispute that they contracted with a new operator or that the new operator posted a job listing to hire a new administrator.  A "party's failure to respond to arguments in a summary judgment motion may constitute waiver[.]"  *Prusin v. Canton's Pearls, LLC*, No. 16-cv-0605-JKB, 2017 WL 5126156, at *13 n.17 (D.Md. Nov. 6, 2017) (citing *Mentch v. E. Sav. Bank, FSB*, 949 F.Supp. 1236, 1246-47 (D.Md. 1997)).  By failing to respond, Sellers have conceded that they did, in fact, contract with a new operator without Purchaser's consent and that the new operator posted a job listing to hire a new administrator.  Purchaser, however, has not shown that this breach was material, *i.e.*, that further performance of the contract once Sellers contracted with a new operator would be different in substance from that for which the parties contracted.  *Barufaldi*, 196 Md.App. at 23 (quoting *Dialist*, 42 Md.App. at 178).

In sum, Purchaser has not demonstrated that no genuine dispute of fact exists as to whether Sellers breached the APA with respect to post-execution operation of the Facility.

### c. Interference with License Approval

Third, Purchaser asserts that Sellers breached the APA by sending a notice to the Office of Health Care Quality of the Maryland Department of Health requesting that it refrain from "transmit[ting] any of [Sellers'] licenses, information[,] or data to the Purchaser." (ECF Nos. 137, at 19-20; 147, at 18-19) (quoting ECF No. 22-6, at 2). Sellers argue that their obligation to refrain from impairing Purchaser's ability to obtain license approval is excused in light of Purchaser's repudiation and Sellers' termination. (ECF Nos. 143, at 30-31; 144, at 30-31). They assert that because this action occurred after Purchaser repudiated and Sellers terminated the APA, it is irrelevant to determining which party breached first. (*Id.* at 31).

The APA provides that "Seller[s] will not intentionally or knowingly take any action or fail to undertake any obligation within Seller[]s['] reasonable control which would prevent or impair the ability of Purchaser to obtain any of the License Approval[.]" (ECF Nos. 115-9, at 25; 119-9, at 25). Sellers indeed sent the letter to the Office of Health Care Quality after Sellers terminated the APA. (ECF Nos. 22-5, at 2; 22-6, at 2). The APA provides that if either party defaults, the parties will be relieved of their obligations except those specifically stated to survive termination. (ECF Nos. 115-9, at 39; 119-9, at 39). The APA does not specifically state that Sellers' obligation to

refrain from impairing Purchaser's ability to obtain license approval survives termination, and in fact provides that Sellers' obligations pending closing will apply "unless this Agreement is earlier terminated[.]" (ECF Nos. 115-9, at 20, 39; 119-9, at 20, 39).  As will be explained below, questions of material fact remain as to whether Mr. Kahanow's email constituted a repudiation of the APA on the part of Purchaser.  If Purchaser repudiated the APA, then Sellers' obligation to refrain from intentionally or knowingly impairing Purchaser's ability to obtain license approval would be excused.  *Choice Hotels Int'l, Inc. v. Madison Three, Inc.*, 83 F.Supp.2d 602, 607-08 (D.Md. 2000) (first citing *Friedman v. Katzner*, 139 Md. 195, 114 A. 884, 886-87 (1921); then citing *C. W. Blomquist & Co. v. Cap. Area Realty Invs.*, 270 Md. 486, 494 (1973)) (noting that the defense of anticipatory repudiation "excuses one party to a contract from its performance obligations upon an unequivocal act of repudiation of the contract by the other party[]").  Thus, Purchaser has not demonstrated that no questions of material fact remain as to whether Sellers' purported interference with license approval after their termination constitutes a breach.

### d. Appraisal of the South Wooded Parcel

Fourth, Purchaser asserts that Sellers breached the APA by failing to deliver an appraisal of the South Wooded Parcel. (ECF Nos. 137, at 20; 147, at 19).  Sellers contend that they did not

41

have a definite deadline by which to obtain or provide the appraisal, and that there was no obligation for Purchaser to purchase the South Wooded Parcel before closing on the APA. (ECF No. 144, at 29-30). They also confirm that they did obtain an appraisal but did not share it with Purchaser because Purchaser indicated it may not be able to close. (*Id.* at 30).

The APA provides that "Purchaser shall have the option to purchase the South Wooded Parcel . . . After the Effective Date, Seller shall obtain an appraisal for the value of the South Wooded Parcel and shall deliver said appraisal to the Purchaser[.]" (ECF Nos. 115-9, at 27; 119-9, at 27). The APA does not specify an exact deadline by which Sellers must deliver the appraisal, but it does provide as a condition precedent to Purchaser's obligations that "Purchaser shall have ten (10) days from receipt of the Seller Appraisal to either accept the value set forth in the Seller Appraisal . . . or notify Seller that it will obtain its own appraisal[.]" (ECF Nos. 115-9, at 26-27; 119-9, at 26-27). Because the ten-day requirement is a condition precedent to Purchaser's performance, Sellers were required to satisfy the condition before closing. In order to satisfy the condition, Sellers would have to provide the appraisal at least ten days before closing. It is undisputed that they did not; in fact, Sellers terminated the APA eight days before the transaction was to close. (ECF No. 147-28, at 2).

If, however, Purchaser repudiated the APA, then Sellers would be excused from their obligation to deliver the appraisal within ten days of closing. *Choice Hotels*, 83 F.Supp.2d at 607-08 (citing *Friedman*, 114 A. at 886-87; *C. W. Blomquist*, 270 Md. at 494). As will be explained below, Purchaser has not shown that no questions of material fact remain as to whether Sellers breached first. If in fact Purchaser breached first, then Sellers' obligation would be excused. Thus, it would be premature to conclude that Sellers' failure to deliver the appraisal within ten days of closing constituted a material breach of the APA.

### e. Delivering the Facility to Purchaser

Fifth, Purchaser contends that Sellers breached the APA by failing to deliver the Facility to Purchaser. (ECF Nos. 137, at 20-21; 147, at 19-20). Sellers argue that their obligation to convey the property is excused in light of Purchaser's repudiation and Sellers' termination. (ECF No. 144, at 30-31). Because questions of material fact remain as to which party breached first, Sellers' obligation to deliver the Facility may be excused. Hence, Purchaser has not shown that Sellers' failure to deliver the Facility constituted a material breach of the APA.

### f. Negotiation in Good Faith

Finally, Purchaser argues that Sellers breached the APA by failing to negotiate the Condo Agreements in good faith. (ECF Nos. 137, at 16; 147, at 15). Specifically, it contends that:

43

(1) Sellers improperly terminated the APA in its notice letter, which incorrectly stated that Mr. Kahanow confirmed that Purchaser could not secure the full purchase price and would not close on February 1, 2023; (2) Sellers' CEO Andrea Dwyer contemplated selling the Facility to another entity while still under contract with Purchaser; and (3) after Sellers filed suit, they sent an offer to at least twenty people to lease and eventually purchase the Facility, and eventually contracted with Green Tree. (ECF Nos. 137, at 16-19; 147, at 15-18).

Sellers maintain that Purchaser does not allege that they engaged in bad faith before Mr. Kahanow repudiated the APA on January 11, 2023, and that they had no obligation to operate in good faith post-termination. (ECF No. 144, at 27-29). They also assert that they did negotiate in good faith in February 2023, which led to the drafting of the Second Amendment. (*Id.* at 29).

As the court noted in a prior opinion in this case:

> "[T]he covenant of good faith and fair dealing 'does not obligate a [party] to take affirmative actions that the [party] is clearly not required to take under [the contract].'" *E. Shore Markets, Inc. v. J.D. Assocs. Ltd. P'ship*, 213 F.3d 175, 182-83 (4th Cir. 2000) (quoting *Parker v. Columbia Bank*, 91 Md.App. 346, 604 A.2d 521, 531 (1992)) (alteration in original). Rather, the duty "simply prohibits one party to a contract from acting in such a manner as to prevent the other party from performing his obligations under the contract." *Parker*, 91 Md.App. at 366. "A breach of the covenant of good faith and fair dealing supports another cause of action, such

> as breach of contract" and is thus "merely
> part of an action for breach of contract."
> *Zos v. Wells Fargo Bank, N.A.,* No. 16-cv-
> 00466-GJH, 2017 WL 221787, at *3 (D.Md. Jan.
> 18, 2017) (citing *Mount Vernon v. Branch*, 170
> Md.App. 457, 471-72 (2006)).

(ECF No. 87, at 14-15). As explained, Purchaser has not shown that no genuine dispute of material fact exists as to whether Sellers materially breached the APA. Thus, a failure to negotiate in good faith by itself is insufficient to establish a breach.

In sum, Purchaser has not met its burden to show that no genuine questions of material fact exist as to whether Sellers materially breached the APA. Thus, Purchaser is not entitled to any remedy, particularly not specific performance. Purchaser's amended cross-motion for summary judgment on Count I of the counterclaim will be denied in its entirety. Additionally, partial summary judgment will be entered in Sellers' favor on the issue of whether Sellers breached the APA by decreasing direct patient care hours.

## B. Purchaser's Motion for Summary Judgment on Counts II and III of the Counterclaim

Purchaser also seeks summary judgment on Counts II and III of the counterclaim. (ECF No. 148).

### 1. Count II of the Counterclaim

In Count II of the counterclaim, Purchaser alleges that Sellers anticipatorily breached the APA by wrongfully terminating the APA in their January 24, 2023 letter to Purchaser. (ECF No.

22 ¶¶ 61-66).   Purchaser argues it is entitled to summary judgment
on Count II of the counterclaim because Sellers' termination letter
constituted "a definite, specific, positive, and unconditional
repudiation of the contract by" Sellers.   (ECF No. 148, at 4)
(quoting *Transamerica Premier Life Ins. Co. v. Selman & Co., LLC*,
401 F.Supp.3d 576, 596 (D.Md. 2019)).   Purchaser contends that
Sellers terminated the deal because they were frustrated that
Purchaser was withholding consent to the proposed condominium
documents and plat.   (*Id.*).   Purchaser insists, however, that the
APA does not set a timeline for it to respond to Sellers' proposals
regarding the condominium regime, and in any event, it did not
intentionally delay.   (*Id.* at 5).   Indeed, Purchaser argues that
Mr. Kahanow did everything in his power to close the deal, and
that Purchaser's general counsel's schedule was delayed by his
wife's two hospitalizations, but he nonetheless hired two outside
counsel to assist him in responding to Sellers' condominium terms.
(*Id.*).

Additionally, Purchaser maintains that it did not state that
it would not or could not pay the full price in its January 11,
2023 request for a $1.5 million purchase price reduction.   (*Id.*).
It asserts that it expressly rejected Sellers' assertion that it
could not meet its funding obligations before closing.   (*Id.* at
6).   Purchaser also contends that the APA did not require it to

confirm that it could fund the purchase prior to closing. (*Id.* at 6).

Sellers respond that material disputes of fact exist as to which party breached first and whether their termination was reasonable. (ECF Nos. 140, at 5; 141, at 5). Specifically, Sellers contend that they are entitled to the inference that Mr. Kahanow's January 11, 2023 email requesting a price reduction constituted a repudiation of the APA. (*Id.*). They argue that the court should infer from Mr. Kahanow's wording that if Purchaser's proposal to reduce the purchase price was not acceptable to Sellers, Purchaser would walk away from the deal. (ECF Nos. 140, at 7; 141, at 7).

Purchaser reiterates in its reply that because no evidence indicates that it breached the duty of good faith and fair dealing during negotiation of the condo agreements, Sellers cannot use the implied duty to argue that Purchaser should have responded to their proposed Condo Documents within a certain time frame. (ECF No. 150, at 2-6). Purchaser also argues that no reasonable factfinder could conclude that it repudiated the APA, and that Sellers' termination in fact constitutes an anticipatory breach. (*Id.* at 6-11).

To establish an anticipatory breach of contract under Maryland law, "there must be a definite, specific, positive, and unconditional repudiation of the contract by one of the parties to

47

the contract." *C. W. Blomquist*, 270 Md. at 494.   "[W]hen 'in anticipation of the time of performance one definitely and specifically refuses to do something which he is obligated to do, so that it amounts to a refusal to go on with the contract, it may be treated as a breach by anticipation, and the other party may, at his election, treat the contract as abandoned, and act accordingly.'" *Transamerica*, 401 F.Supp.3d at 596 (quoting *C. W. Blomquist*, 270 Md. at 494).

The *C. W. Blomquist* court distinguished between expression of inability to perform and repudiation:

> It has been thought that a mere expression of inability to perform in the future is not a repudiation of duty and cannot be operative as an anticipatory breach.  Of course, the expression of a doubt as to whether the ability to perform in accordance with the contract will exist when the time comes, is not a repudiation.  A statement of inability to perform, however, may be so made as to justify the other party in understanding it as a definite repudiation.  There may be cases in which expressions of inability by one party or an existing appearance of inability on his part to perform will justify the other party in nonperformance of his part of the contract or in materially changing his position so as to make performance impossible, without at the same time operating as an anticipatory breach, for which an action for damages could be maintained.

*C. W. Blomquist*, 270 Md. at 495 (quoting Arthur Linton Corbin, 4 *Corbin on Contracts* § 974 (1951)).

Here, a reasonable factfinder could construe Mr. Kahanow's statement that Purchaser "would need a $1.5MM adjustment in the purchase price to move forward" as a request to modify the APA or an expression of doubt as to whether it could perform. Such an interpretation would lead to the conclusion that Purchaser did not repudiate the APA and Sellers anticipatorily breached the APA by terminating it. (ECF Nos. 115-23, at 2; 119-23); *see also J.E. Dunn Const. Co. v. S.R.P. Dev. Ltd. P'ship*, No. 11-cv-1948-DKC, 2014 WL 3865993, at *6 (D.Md. Aug. 5, 2014) ("[A]n expression of doubt by [plaintiff] as to whether it could perform does not rise to the level necessary to constitute anticipatory breach."); *Harrell v. Sea Colony, Inc.*, 35 Md.App. 300, 306 (1977) (quoting 6 *Corbin on Contracts* § 973) ("A mere request for a change in the terms or a request for cancellation of the contract is not in itself enough to constitute a repudiation."). The fact that Purchaser responded to Sellers' request for adequate assurances by explaining that it "never stated any inability to perform such Closing obligations nor has it stated its inability to fund the acquisition[]" and that it "is hopeful that all issues can be remedied, resulting in a successful closing and a highly compatible future together for the parties as neighbors" supports this interpretation. (ECF Nos. 115-25, at 2, 4; 119-25, at 2, 4; 147-27, at 2-3).

In contrast, a reasonable factfinder could also construe the request for a $1.5 million price reduction coupled with the statement that "we are waiting on confirmation if the bank will have everything they need to close by Feb 1st or if they will need to push the closing off for 2 weeks[]" as a definite and specific refusal to perform Purchaser's obligation to pay the purchase price specified in the APA or to close by February 1, 2023. (ECF Nos. 115-9, at 6-7; 115-23, at 2; 119-9, at 6-7; 119-23). Although not containing identical facts (and applying North Carolina law, which is virtually identical to Maryland's anticipatory breach law), the court's decision in *Inmar Brand Sols., Inc. v. Infinity Sales Grp., LLC*, No. 1:18-cv-761-CCE, 2019 WL 5597894 (M.D.N.C. Oct. 30, 2019), is instructive.  There, the parties entered into a contract in which the plaintiff agreed to arrange advertisements for the defendant's client, and the defendant agreed to pay the plaintiff and to provide artwork for the advertisements to the plaintiff.  *Id.* at *1.  A few weeks later, the defendant sent the plaintiff an email stating that it could not continue and that it would cancel the contract unless it received a price reduction. *Id.* at *2.  The defendant also ceased providing artwork to the plaintiff.  *Id.*  The court declined to enter summary judgment for either party, holding:

> The language of the email coupled with the actual cessation of performance can be interpreted as a "distinct, unequivocal, and

> absolute" refusal to perform by [defendant],
> not merely strategic posturing.  On the other
> hand, [defendant's CEO] testified that her
> email was simply aggressive bargaining, and it
> followed a conversation between the parties
> during which options were discussed.    The
> factfinder could conclude that [defendant] was
> simply trying to make a better deal if
> possible, not refusing to perform.

*Id.* at *4 (internal citation omitted).  Here, the interpretation
that Mr. Kahanow's statements constituted a refusal to perform is
also reasonable.  Additionally, Mr. Kahanow's statement that he
"pushed [closing] off to 3/1 to buy more time"—although made later—
could also lend support for the conclusion that the language in
his email constituted a refusal to perform.  (ECF Nos. 115-2, at
2; 119-2).

Construing the facts in the light most favorable to Sellers,
a question of material fact remains as to whether Purchaser
repudiated the APA in Mr. Kahanow's email.  If indeed Purchaser
repudiated the APA, then Sellers' termination would not constitute
an anticipatory breach.  *See C. W. Blomquist*, 270 Md. at 495
(explaining that if one party anticipatorily breaches the
contract, the other party may treat the contract as abandoned and
act accordingly).  Consequently, Purchaser's motion for summary
judgment on Count II of the counterclaim will be denied.

### 2. Count III of the Counterclaim

In Count III of the counterclaim, Purchaser alleges that
Sellers materially breached the Side Agreement by refusing to

return the $400,000 released to Sellers under the Side Agreement when the parties failed to reinstate the APA. (ECF No. 22 ¶¶ 67-71). The court previously awarded Purchaser summary judgment on Count III of the counterclaim, concluding that Sellers breached the Side Agreement by refusing to return the $400,000, but deferred entering judgment in Purchaser's favor because the parties had not addressed whether entering final judgment was appropriate under Rule 54(b). (ECF No. 87, at 16-18).

Purchaser now requests that the court enter judgment on Count III of the counterclaim because there is "no just reason for delay[.]" (ECF No. 148, at 6-8) (quoting *Braswell Shipyards, Inc. v. Beazer E., Inc.*, 2 F.3d 1331, 1335-36 (4th Cir. 1993)). They assert that: (1) Count III is not closely related to Purchaser's other remaining claims; (2) any need for review of the determination that Sellers breached the Side Agreement and must return the $400,000 to escrow will not be mooted by any future developments in this matter; (3) there is no risk that the Fourth Circuit will have to review the issues concerning Count III more than once; (4) no claim or counterclaim exists which could offset any award the court renders as to Count III; and (5) nothing else weighs in favor of delaying entry of final judgment. (*Id.* at 8). They also note that returning the money would not cause any financial risk to Sellers because they are under contract with a

new entity to operate the facility, but Purchaser will suffer undue hardship if final judgment is not entered. (*Id.*).

Sellers respond that: (1) the claims raised in Count III of the counterclaim are closely intertwined with other claims because Purchaser has put the validity of the Second Amendment at issue by requesting specific performance in Count I of its counterclaim; (2) it is premature to enter judgment until the court has found an enforceable agreement on lot lines within the Second Amendment; (3) because Purchaser would be entitled to liquidated damages under the APA if Sellers are found to be in breach, there will not be a fixed sum of money owed to Purchaser until Count II of the counterclaim is resolved; and (4) because there will almost certainly be appeals on the court's decision on the cross-motions for summary judgment on specific performance, entering judgment now would result in multiple appeals. (ECF Nos. 140, at 12; 141, at 12).

Purchaser replies that damages for Sellers' breach of the Side Agreement are fixed and in no way dependent on damages that may be awarded under the APA, and that the claims are not intertwined because Purchaser does not seek to enforce the Second Amendment but merely offers it as extrinsic evidence that the parties agreed on lot lines for the condominium plat during negotiations. (ECF No. 150, at 12-13).

Rule 54(b) of the Federal Rules of Civil Procedure provides:

> When an action presents more than one claim
> for relief--whether as a claim, counterclaim,
> crossclaim, or third-party claim--or when
> multiple parties are involved, the court may
> direct entry of a final judgment as to one or
> more, but fewer than all, claims or parties
> only if the court expressly determines that
> there is no just reason for delay. Otherwise,
> any order or other decision, however
> designated, that adjudicates fewer than all
> the claims or the rights and liabilities of
> fewer than all the parties does not end the
> action as to any of the claims or parties and
> may be revised at any time before the entry of
> a judgment adjudicating all the claims and all
> the parties' rights and liabilities.

Rule 54(b) certification involves two steps. *Braswell*, 2 F.3d at 1335. First, the court must determine whether the judgment is "'final' in the sense that it is 'an ultimate disposition of an individual claim entered in the course of a multiple claims action[,]'" and second, it must "determine whether there is no just reason for the delay in the entry of judgment." *Id.* (quoting *Curtiss-Wright Corp. v. Gen. Elec. Co.*, 446 U.S. 1, 7 (1980)). In determining whether there is no just reason for delay in the entry of judgment, courts consider:

> (1) the relationship between the adjudicated
> and unadjudicated claims; (2) the possibility
> that the need for review might or might not be
> mooted by future developments in the district
> court; (3) the possibility that the reviewing
> court might be obliged to consider the same
> issue a second time; (4) the presence or
> absence of a claim or counterclaim which could
> result in a set-off against the judgment
> sought to be made final; (5) miscellaneous

> factors such as delay, economic and solvency
> considerations, shortening the time of trial,
> frivolity of competing claims, expense, and
> the like.

*Id.* (quoting *Allis-Chalmers Corp. v. Philadelphia Elec. Co.*, 521 F.2d 360, 364 (3d Cir. 1975)).  "The burden is on the party endeavoring to obtain Rule 54(b) certification to demonstrate that the case warrants certification."  *Id.* (citing *Allis-Chalmers*, 521 F.2d at 364).

Because of the importance of preventing piecemeal appeals of a case, a "Rule 54(b) certification is recognized as the exception rather than the norm.  It should neither be granted routinely, nor as an accommodation to counsel."  *Id.* (internal citation omitted) (first citing *Curtiss-Wright*, 446 U.S. at 10; then citing *Corrosioneering v. Thyssen Env't Sys., Inc.*, 807 F.2d 1279, 1282 (6th Cir. 1986)).  Furthermore, "it is settled that certification of a judgment as to a claim or party in a multi-claim or multi-party suit is disfavored in the Fourth Circuit."  *Bell Microproducts, Inc. v. Global-Insync, Inc.*, 20 F.Supp.2d 938, 942 (E.D.Va. 1998) (citing *Lyles v. Popkin*, 36 F.3d 1093, 1994 WL 525824, at *1 (4th Cir. 1994)).

Here, the court's judgment that Sellers breached the Side Agreement by failing to return the deposit when Purchaser did not execute the Second Amendment is final in the sense that it is "an

ultimate disposition" of Count III of the counterclaim. *Braswell*, 2 F.3d at 1335 (quoting *Curtiss-Wright*, 446 U.S. at 7-8).

Purchaser has not met its burden, however, to show that there is no just reason for the delay in entry of judgment. Count III of the counterclaim is closely related to Purchaser's other claims because, as Sellers argue, Purchaser "has put the validity of the Second Amendment at issue in the still-open counts by claiming (however incredulously) that the Court can find within the Second Amendment an enforceable agreement on the lot lines sufficient to grant specific performance, which [Purchaser] requests in Count I of its Counterclaim." (ECF Nos. 140, at 12; 141, at 12). In Count III of the counterclaim, Purchaser alleges that the parties did not agree to a Second Amendment, (ECF No. 22 ¶ 69), but it now seeks enforcement of the lot lines in the Second Amendment. Even though Purchaser insists that it does not seek to enforce the Second Amendment itself, but rather uses the Second Amendment as extrinsic evidence to show that the parties agreed on lot lines, (ECF No. 150, at 13), its reliance on the lot lines in the Second Amendment in requesting specific performance indicates that the claims are intertwined. Relatedly, entering judgment could result in the Fourth Circuit being forced to review the validity of the Second Amendment twice.

That the deposit was placed into Sellers' general account does not require the conclusion that there is no just reason for

the delay in the entry of judgment.  Indeed, Sellers' corporate designee, Terry Weaver ("Mr. Weaver"), testified in his deposition that the deposit went into Sellers' general account and was earmarked in the sense that it was recognized as a liability on the balance sheet.  (ECF No. 129-8, at 5).  When asked whether Sellers have used the cash, Mr. Weaver stated that "cash is fungible.  I can't point to that $400,000 and say that belongs to them.  That's the purpose of recognizing the liability." (*Id.* at 6).  When asked "if it was used, what would it have been used for[,]" Mr. Weaver answered that "[i]t would have been used for operations." (*Id.* at 7).  Mr. Weaver never stated that Sellers no longer had the $400,000, or would not be able to return it.  Purchaser has not demonstrated that Sellers are at risk of insolvency or any other compelling reason why it would be unjust to receive the deposit, plus a considerable amount of interest, upon adjudication of all claims.

Consequently, Purchaser's motion for entry of final judgment on Count III of the counterclaim will be denied.

## IV. Conclusion

For the foregoing reasons, the motions to seal will be granted, Sellers' motion for partial summary judgment on Count I of the counterclaim will be denied, Purchaser's amended cross-motion for summary judgment on Count I of the counterclaim will be denied, and Purchaser's amended motion for summary judgment on

Counts II and III of the counterclaim will be denied.  Partial summary judgment will, however, be entered in Sellers' favor on the issue of whether Sellers breached the APA by decreasing direct patient care hours.  A separate order will follow.

                                              /s/
                                  DEBORAH K. CHASANOW
                                  United States District Judge